Guadalupe GUAJARDO, Jr., Allen Lamar, Ronald Kent Franks, James E. Baker, Thomas E. Hill, and Lawrence Pope, individually and on behalf of all present and future inmates of Texas Department of Corrections, Plaintiffs,

v.

W.J. ESTELLE, Jr., Director, Texas Department of Corrections, et al., Defendants.

Civ. A. No. 71–H–570.

United States District Court, S.D. Texas, Houston Division.

July 14, 1983.

Karl S. Stern, Harry M. Reasoner, Ann Lents, Robert M. Roach, Jr., Vinson & Elkins, Houston, Tex., for plaintiffs.

Nancy Simonson, Asst. Atty. Gen., Austin, Tex., and Gerald G. Fall, Jr., Gen. Counsel, Texas Dept. of Corrections, Huntsville, Tex., for defendants.

## MEMORANDUM AND ORDER

SINGLETON, Chief Judge.

This class action was brought by prison inmates challenging the constitutionality of the Texas Department of Corrections (TDC) correspondence rules and practices. The parties have executed and presented to the court a settlement agreement including a final revised version of the TDC correspondence rules, pursuant to rule 23 of the Federal Rules of Civil Procedure. After notice to the class members and the receipt of objections, a hearing was held to determine the fairness, reasonableness, and adequacy of the settlement. One issue, whether TDC must give inmates in solitary confinement access to publications received through the mail, was not settled and was tried to the court. Following a discussion of the background of this case, the court now makes findings of fact and conclusions of law as to the settlement agreement and as to the punitive segregation issue.

## I

## BACKGROUND

In 1971, Guadalupe Guajardo, Jr., an inmate at TDC, filed this suit under 42 U.S.C. § 1983, as a class action on behalf of all TDC inmates, alleging that defendants' correspondence rules and practices violated the plaintiffs' constitutional rights. The action was consolidated with another civil rights case filed against defendants by Guajardo, number 71–H–570, under 71–H–570, and an evidentiary hearing was held. On September 25, 1972, following the evidentiary hearing, this court filed a Memorandum and Order finding a substantial number of the TDC mail rules invalid on first, sixth, and fourteenth amendment grounds, modifying certain rules and striking others, and enjoining TDC from following any procedures in conflict with the principles outlined by this court in its Memorandum and Order. *Guajardo v. McAdams,* 349 F.Supp. 211, 221–222 (S.D.Tex.1972). On January 1, 1974, in a case involving consolidated appeals concerning the rights of inmates in state prisons, the Fifth Circuit held that injunctive relief could only be granted by a three judge panel under 28 U.S.C. § 2284, since TDC rules and regulations constitute statutes of the state within the meaning of 28 U.S.C. § 2281. *Sands v. Wainwright,* 491 F.2d 417, 428–429 (5th Cir.1973), *cert. denied,* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974). The circuit court therefore reversed and remanded *Guajardo.*

Following the rulings by the district and appellate courts, on August 7, 1975, plaintiff was granted leave to amend his original complaint, and filed an amended complaint, which withdrew his petition for injunctive relief and continued his request for declaratory judgment. The parties then entered into lengthy settlement negotiations. The TDC promulgated new rules and regulations, which were conditionally approved by this court. The named plaintiff maintained constitutional objections to many of the rules and, on September 8, 1976, at the settlement hearing, this court severed the issues, approving the undisputed rules and setting for trials the disputed rules. Trial was held December 6–22, 1976, and this court entered a Memorandum and Order and a Final Judgment on June 7, 1977. In the Memorandum and Order, this court determined that TDC's rules were unconstitutional in part and set out the minimum changes necessary to protect the plaintiffs' constitutional rights. *Guajardo v. Estelle,* 432 F.Supp. 1373, 1380–1386 (S.D.Tex.1977). This case was again appealed to the Fifth Circuit, which affirmed most of the rules approved by this court and modified others. The Fifth Circuit then affirmed the judgment as modified. *Guajardo v. Estelle,* 580 F.2d 748· (5th Cir.1978).

Following the action of the court of appeals, the parties again entered settlement negotiations. On July 18, 1979, the plaintiffs moved to enjoin the TDC from violating the rules as modified. Defendants contested this remedy, arguing that plaintiffs were required to file a new lawsuit to obtain injunctive relief; that plaintiffs were required to show that the individual defendants had a plan or policy showing authorization or approval of violations of the rules;

that plaintiffs must establish a pattern and practice of systematic violations of the correspondence rules of constitutional magnitude; that the TDC and defendants had in good faith adopted and implemented the new correspondence rules; that plaintiffs had not properly utilized the administrative review procedure; that a request for injunctive relief was premature because the defendants' review of the use of the new rules had not been completed; that the named plaintiffs were not adequate class representatives; and that the only federal court with jurisdiction to enter an injunction is a three judge court empaneled under 28 U.S.C. § 2281.

The Plaintiffs' Motion for Injunctive Relief was held in abeyance until February 1980 pursuant to a Memorandum of Understanding between the parties that was approved by the Court September 28, 1979. The Memorandum of Understanding established that the TDC would set up a program to monitor compliance with the TDC's mail rules. It provided that an independent consultant would be selected to oversee the monitoring program, to evaluate TDC's mail practices, and to recommend changes in the TDC's mail practices and policies. The consultant would report to the Director of the TDC, counsel for the plaintiffs, and the Court regarding the status of the implementation of the rules. The consultant could not order changes in the TDC policy or practice but could investigate TDC practices either independently or with TDC staff members. The consultant could communicate in any way with any inmate, TDC employee, outside correspondent, attorney, editor, publisher, media representative, or any other person as he saw fit. Inmates had the right to send sealed and confidential correspondence to the consultant, and no inmate could be disciplined in any way for corresponding with or talking with the consultant. Attorneys for the plaintiffs were allowed to communicate confidentially with the consultant. Although payment of the independent consultant was handled through the TDC, the amount and timing of payments to the consultant were not at the discretion of the TDC but were determined by mutual agreement of the attorneys for plaintiffs and the TDC. Both parties reserved the right to disagree with the conclusions of the consultant.

Pursuant to this Memorandum of Understanding and Order, Dr. Sherman Day was agreed upon by the parties as the independent consultant. Dr. Day was agreed upon after plaintiffs attorneys had investigated his background and the background of other potential consultants. Dr. Day is eminently qualified to serve in the role of independent consultant or in the role of Court-appointed monitor in this case.

Dr. Day submitted his final report to the Director at the conclusion of the first monitoring period, which ended in April 1980. After this date, Dr. Day continued to serve as an independent consultant under the same conditions, although in an informal manner. In April 1981, the parties entered into the second Memorandum of Understanding, in which the parties provided for the continuation of the appointment of Dr. Day as their independent consultant on the same basis that he had been retained in the first Memorandum of Understanding. The inmate population was informed of Dr. Day's appointment, his mailing address and responsibilities, and of their right to send sealed correspondence and communicate confidentially with him by means of a notice published in *The Echo*. Following the consulting period, the Agreement provided that Dr. Day would submit written recommendations to the court and to the parties by February 1982 concerning any rules, practices, or procedures which, in his opinion, required modification or clarification. The plaintiffs' motion for injunctive relief was held in abeyance until such time. In the memorandum, the parties also reached certain agreements regarding correspondence practices, which were incorporated into the final settlement agreement and are reflected in the rules that are now before the court as a part of the settlement.

Pursuant to the second Memorandum of Understanding between the parties, in October 1981, Dr. Day submitted his report to the court and to the attorneys for the par-

ties evaluating the degree of implementation of the correspondence rules and the procedures set forth in the Memorandum of Understanding for the period from July 1981 to October 1981. In January 1982, Dr. Day submitted a similar report reviewing the degree of implementation for the months of November and December 1981. In his final report of April 1982, Dr. Day made his final recommendations for changes in TDC rules, practices, and procedures. These recommendations were submitted to the attorneys for the parties.

On September 7, 1982, a status conference was held before this court, at which the parties informed the court that they would submit an agreed order for preliminary approval of settlement. Thereafter, on February 23, 1983, a settlement conference was held at which this court granted the parties' joint motion for leave to settle this action. The court preliminarily approved the settlement agreement and a new set of TDC correspondence rules pursuant to rule 23 of the Federal Rules of Civil Procedure. In accordance, TDC published notice of the revised rules to class members. All objections to the rules were ordered to be filed with this court by April 18, 1983 and hearing was set for May 3, 1983, to be followed by a hearing on an issue upon which the parties disagreed, that of mail practices in punitive segregation.

The hearing on the settlement of the class action was held before this court on May 3 and 9, 1983, and the hearing on the punitive segregation issue was held on May 9 and 10, 1983. The court now makes the following findings of fact and conclusions of law on the settlement agreement and the revised TDC correspondence rules, followed by separate findings of fact and conclusions of law on the punitive segregation issue.

## II

### THE SETTLEMENT AGREEMENT

Dr. Day's activities as an independent consultant were closely analogous if not identical to those that would be performed by a court-appointed monitor. Dr. Day received hundreds of letters from inmates and other persons regarding TDC correspondence practices. He interviewed numerous inmates. He visited TDC institutions numerous times and interviewed inmates both in response to requests for interviews and letters of complaint and on an unsolicited "drop in" basis. He had access to TDC records and mail rooms. Dr. Day followed up on the great majority of inmate complaints received during the formal monitoring periods on an individual basis. He was in all respects satisfied with his access to information about the TDC system and its operation. Dr. Day's access to inmates, plaintiff's counsel, and TDC personnel, institutions and records, has been adequate to allow him to assess the degree of compliance achieved by the Texas Department of Corrections with the correspondence rules. Dr. Day has discharged his duties as independent consultant in an impartial, thorough, and professional manner. Objections to the impartiality, appointment, and conduct of Dr. Day are therefore overruled.

The Plaintiffs and their counsel have had adequate sources of information to assess possible liability and relief. Although no formal discovery on the motion for injunction has taken place, counsel for plaintiffs had adequate information to assess the settlement. There had already been discovery and a week-long trial on the merits of the case. Counsel had extensive correspondence and information supplied by members of the class and access to information acquired by Dr. Day as well. Dr. Day has communicated personally with plaintiff counsel and also submitted detailed reports of his findings that have been available to counsel for plaintiffs. Objections to the lack of discovery on the motion for injunction are therefore overruled.

The proposed settlement is the result of extended, arms-length negotiation by experienced counsel. The amount of time spent by counsel for plaintiffs on the settlement and Dr. Day's observation of the negotiations substantiate this conclusion. Most importantly, the court's judgment of the reasonableness of the settlement itself indi-

cates the adequacy of counsel's representation of the class and of counsel's access to information to evaluate the settlement. The fact that some inmates have filed objections to the rules does not create a conflict of interest either between class members or for the attorneys for the class. The rules will affect all inmates in the same manner. There is no need therefore for identification of any subclasses or for separate representation of individual members or groups within the class. Objections to the adequacy of representation of the plaintiff class and requests for recognition of subclasses are therefore overruled.

In making these findings of fact and conclusions of law, this court has relied upon the representations of experienced counsel representing both sides in this litigation; the reports, letters and testimony of the independent consultant, Dr. Sherman Day; matters of record in this litigation, including the two previous trials and appeals in this case; testimony offered at the hearing on settlement approval; and the comments of the objectors and of the named class representatives regarding the settlement.

### A. The Overall Settlement

■ In evaluating the proposed settlement, the Court has been guided by the principles announced in *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 1012, 102 S.Ct. 2283, 2308, 73 L.Ed.2d 1294, 1309 (1982). *See also Pettway American Cast Iron Type Co.,* 576 F.2d 1157 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Cotton v. Hinton,* 559 F.2d 1326 (5th Cir.1977). The circuit court in *In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212–218, adopted a three-step analysis for a trial court's use in evaluating the settlement in the class action. In determining whether the settlement is fair, adequate, and reasonable, the trial court is directed to evaluate a proposed settlement in light of (a) the range of possible recovery that plaintiffs would obtain if they prevailed at trial, (b) the likelihood that the plaintiffs would prevail at trial, and considering the foregoing,

(c) whether the proposed settlement falls within the range of possible recovery. *Id.*

■ If plaintiffs had prevailed at trial on their motion for injunction, plaintiffs' range of possible recovery would include principally (a) the issuance of an injunction and (b) the appointment of a monitor with full powers to investigate and report to the Court on the TDC's implementation of the correspondence rules and to make recommendations to the court regarding changes in the rules or procedures necessary to achieve compliance. Securing this coercive order of the court would entitle plaintiffs to seek contempt sanctions against defendants, including future appointment of a monitor, should further failure to follow the correspondence rules be shown.

The plaintiffs and the class would face certain obstacles to prevailing on the merits if they took the motion for injunction to trial against Defendants. Dr. Day's opinion that the TDC is in substantial compliance with the rules would of course be an impediment to the issuance of an injunction. In a case of this type assessment of the credibility of conflicting claims by inmates and prison officials can be very difficult. This is particularly true in connection with mail procedures and such allegations as unauthorized opening and resealing of attorney mail, failure to handle the mail in a timely manner, access to writing materials in segregation, and other similar allegations. Nevertheless, the number of inmate complaints and allegations of failure to follow the rules by the TDC are substantial, and the court therefore finds that plaintiffs were likely to prevail in their request for an injunction.

As stated above, the court finds that the possible range of recovery by plaintiffs if they were to prevail at trial would be issuance of an injunction, appointment of a monitor, and specific disapproval of certain TDC practices. In the settlement, the plaintiffs were able to secure substantially more modifications in the TDC correspondence rules and practices than they would have achieved had they prevailed on their request for injunction.

In the settlement agreement defendants and the TDC agreed to follow the rules as modified. Many objectors express the belief that the TDC will not comply with their agreement to follow the rules. The agreement provides that should the settlement be formally approved by the court a final judgment should be requested ordering that the settlement agreement be carried out in accordance with its terms. In effect then the settlement agreement secures for the plaintiffs an order compelling compliance with the rules. This order will be enforceable by contempt action should it not be followed by either defendants or the TDC.

Pursuant to the Memoranda of Understanding, compliance of defendants and the TDC with the rules has already been subjected to a lengthy monitoring period. Although Dr. Day has been called an independent consultant and has submitted reports formally to the TDC as well as to the court, the functions that Dr. Day has performed have been in virtually all respects identical to those that would be performed under court-ordered monitoring. *See* Nathan, *The Use of Masters in Institutional Reform Litigation,* 10 Toledo Law Rev. 418 (1979).

Through Dr. Day's consultancy many collateral improvements in the TDC's mail system have been accomplished. Many of these improvements would have been difficult to accomplish through formal court procedures. For example, the TDC's staffing patterns for its mail rooms have been changed at Dr. Day's instigation. More staff have been hired, civilian staff are utilized in mail rooms, and more senior officials are in charge of the mail rooms. Training programs for TDC personnel on correct implementation of the mail rules have been created. A manual outlining standard procedures under the rules has been developed and is in use (it will be revised to take into account those changes made in the rules through the settlement agreement). The Mail System Coordinators Panel ("MSCP") has been created and serves to bring uniformity to the decisions of the various units of all aspects of mail handling, including most importantly the review of publications. The practice of reviewing publications issue by issue has been abandoned for many publications, and instead the MSCP now promulgates a list of publications for which issue by issue review is no longer necessary.

As part of the settlement defendants and the TDC have agreed that the TDC will implement an internal monitoring procedure. As Dr. Day opined, having an internal auditing procedure will both encourage system-wide compliance and serve as a significant source of data should a future contempt action be necessary.

Many object that a monitor should be formally appointed by the court to enforce the rules. In light of the extended period of consultancy, virtually equivalent to a monitoring period, that has already occurred in this case; the extensive system-wide improvements that have been made in the TDC mail system; and Dr. Day's opinion that the TDC is in compliance with the rules on a system-wide basis, it is unlikely that the plaintiffs could have secured a monitor had the case been brought to trial. Further, should the TDC fail to follow the rules, the court could order monitoring in the future in addition to other contempt sanctions. Objections that all current TDC personnel should be prohibited from handling inmates' mail, that mail handling should be removed from defendants' supervision, and that no TDC personnel without U.S. post office training should be allowed to handle the mail are overruled; each suggestion is outside the range of possible (and certainly of probable) recovery by plaintiffs.

In short, virtually all of the procedural benefits to the class that could have been achieved through a successful trial of the motion for injunction have instead been achieved through the process of agreement on an independent consultant and on the final settlement.

Two other matters are significant. First, under the settlement agreement, individual members of the plaintiffs class retain the ability to seek damages from the TDC

and/or its officials for both past and future violations of the correspondence rule. Second, plaintiffs' attorneys have agreed not to seek fees in connection with the settlement proceedings in the trial court, although they have reserved the right to seek fees in connection with any appeal of the settlement and/or the punitive segregation trial.

### B. The TDC Mail Rules

The rule changes that are part of the settlement agreement also reflect several agreements benefitting the class that might not have been obtainable through trial on plaintiffs' motion for injunctive relief. Other changes reflect improvements secured by Dr. Day that are formalized in the rules in order to protect future members of the class. Again, these changes might not have been available through a motion for injunction since the TDC has already in most cases implemented them. The changes secured must also be evaluated in light of the fact that many changes in the rules would have been difficult for plaintiffs to accomplish through trial of the motion for injunction since the declaratory judgment portion of the case has been concluded. The question before the court on motion for injunction was only whether its prior decision was being followed by defendants. Further, the court has already in the declaratory judgment action approved the old rules as constitutional. In evaluating objections to the language of the old rules then it must be remembered that these provisions are the result of litigation not settlement. The court's assessment of the various changes in rules follows.

*Rule 3.9.1.1:* As noted above, the procedure previously authorized by the Fifth Circuit by which the TDC could require an inmate to send a post card to a correspondent prior to sending any mail to that correspondent has been omitted. This is a benefit to the class that could not have been achieved by injunctive relief. A requirement that mail boxes be of a size and design that preclude tampering with mail by inmates has been added; this rule could have been achievable had the plaintiffs succeeded at trial on their motion for injunctive relief.

*Rule 3.9.1.3:* The prior rule provided that a short statement of the reason for disapproval of correspondence with an individual will be given both to the inmate and would-be correspondent. The word "short" has been deleted from the rule, reflecting the TDC's agreement that more detailed reasons for denials be given to inmates. This change in the rules is the best result that could have been achieved by plaintiffs at trial on their motion for injunctive relief.

*Rule 3.9.1.4:* The old rule provided that the TDC could use its preprinted stationery for 60 days until its supply was deleted. This part of the rule is now obsolete and has been deleted. A definition of stationery has been added to the rule. A significance of the definition is that stationery may be purchased by outside suppliers by any inmate and the definition therefore determines which items inmates may secure outside of the TDC commissary. The TDC had taken the position that stationery does not include carbon paper, typewriter ribbons, felt tip pens and file folders, arguing that these materials would constitute a security hazard because they would be difficult to inspect. The new rule provides that stationery is "any color paper, not to exceed the size of 9″ × 15″ or unstamped envelopes, including carbon paper, but excluding any paper or envelope with names, addresses, or letterhead." The difficulty of proving that denying receipt from outside suppliers of felt tip pens and file folders, for example, seriously interfered with the exercise of first amendment rights by inmates makes it unlikely that plaintiffs could have succeeded in getting a broader definition of stationery at trial. The TDC's interest in prohibiting inmate businesses and the questionable impact of banning letterhead stationery on the exercise of first amendment rights make it unlikely that plaintiffs could have challenged the letterhead restriction successfully. Further, the rule is an improvement over TDC's prior practice in that it does include carbon paper. Objections to the definition of station-

ery are therefore overruled. Finally, a provision permitting the TDC to require inmates to give their correspondents a preprinted card stating that their mail might be read has been deleted. The deletion would have been difficult to accomplish at trial.

*Rule 3.9.1.6:* The wording of the rule has been changed slightly to clarify that enclosures can only be rejected for the reasons specified in the rule. This is not a substantive change.

*Rule 3.9.1.7:* The rule contains the new requirement that all mail procedures must be conducted by TDC employees only and will be conducted during waking hours whenever possible. The rule also contains a new restriction that all mail will be delivered either to the inmate or to the postal service within 48 hours of receipt except on weekends or holidays when 72 hours is allowed if the holiday immediately precedes or follows the weekend. Each of these provisions are equivalent to the best result plaintiffs could reasonably have achieved on these issues.

*Rule 3.9.1.8:* The definition of contraband has been added to the rule for clarity. The contraband definition has also been changed to limit contraband to those physical items "that present a substantial danger to the safety or security of staff, inmates, or the institution." *See also* Rule 3.9.16 in which the same change appears. This change would probably not have been achievable at trial as the rules had earlier adequately defined contraband to exclude written material disapproved for its content. Objections to the rule are therefore overruled.

*Rule 3.9.2.1:* The second paragraph provides:

All outgoing special correspondence shall be sent sealed and uninspected whether or not addressed to a specific named official. Incoming special correspondence from a specific named official will be delivered to the inmate sealed and uninspected. Incoming special correspondence not from a specific named official shall be opened and inspected for contraband only. The inspection shall be in the inmate's presence. All incoming special correspondence envelopes shall be prominently stamped as received by TDC or cancelled so that franked government envelopes cannot be reused.

Prior to the parties' reaching agreement on this rule, the TDC had taken the position that inmates could send sealed letters under the special correspondence rule only to specific named officials. The TDC justified its position by pointing to the danger that government envelopes might be obtained by unauthorized correspondents and used to introduce contraband into the institution; it also relied on its belief that it was entitled to check the identity of a special correspondent before correspondence needed to be delivered to the inmate. The TDC's contention is supported by the procedure adopted by the Fifth Circuit regarding attorney mail in *Taylor v. Sterrett,* 532 F.2d 462, 475 n. 20 (5th Cir.1976) (attorneys wishing to correspond confidentially with inmates may be required to first identify themselves by means of a signed letter). Under the compromise, inmates may send outgoing special correspondence sealed whether or not they name a specific official. If a specific official is not indicated on the return address of incoming correspondence, it may be opened and inspected for contraband only, thus preserving the confidentiality of the correspondence. Significantly, this procedure was contemplated by the Fifth Circuit in this case. *See Guajardo v. Estelle,* 580 F.2d 748, 759 (5th Cir.1978). The court finds that the compromise is well within the range of recovery plaintiffs were likely to achieve at trial. Objections to the rule are overruled.

*Rule 3.9.4:* The prior media correspondence rule simply provided that inmates could send sealed letters to members of the editorial and reporting staff of any newspaper, magazine, or radio or television station. The TDC had taken the position that media correspondents were only those persons whose principal employment was to gather or report news for

a. A newspaper which qualifies as a general circulation newspaper in the community in which it is published. A news-

paper is one of "general circulation" if it circulates among the general public and if it publishes news of a general character and of general interest. The key test to determine whether a newspaper qualifies as a "general circulation" newspaper is to determine whether the newspaper qualifies for the purpose of publishing legal notices in the community in which it is located or the area to which it is distributed. It is generally held that for a newspaper to be considered by law, a newspaper of general circulation, and so be qualified to publish legal notices, it must contain items of general interest to the public such as news of political, religious, commercial or social affairs;

b. A news magazine which has a general circulation and is sold by newsstands and by mail subscription to the general public;

c. A national or international news service; or

d. A radio or television news program of a station holding a federal communications license.

TDC Operating Manual. As justification for its position the TDC relied upon *Taylor v. Sterrett*, 582 F.2d at 481 n. 28, in which the following Federal Bureau of Prisons definition of press was adopted:

Persons who are substantially employed in the business of gathering or reporting news for (a) a newspaper qualifying as a general circulation newspaper in the community to which it publishes, (b) news magazines having a substantially national circulation being sold by newsstands to the general public and by mail circulation, (c) national or international news services (d) radio and television news programs of stations holding Federal Communication Commission Licenses.

The new rule provides that inmates may send sealed letters to members of the editorial and reporting staff of any newspaper or magazine listed in the *Ayer's Directory of Publications* or the *Editor & Publisher's Yearbook*, or the editorial and reporting staff of any radio or television station. The new rule thus provides an objective stan-

dard for determining which newspapers and magazines qualify to send media correspondence and considerably expands the number of the newspapers and magazines covered from prior TDC practice. The rule also adds a procedure for other members of the media, including free lance members who were excluded by the TDC's prior practice, to petition to the Director's Review Committee to receive sealed letters from inmates.

The Court has reviewed the requirements for inclusion in the *Ayer's Directory*. It finds that the substance of the proposed rule is well within the range of recovery plaintiffs were likely to achieve at trial and may be more than plaintiffs could have secured at trial in light of *Taylor v. Sterrett*. Objections to the substance of the rule are therefore overruled. Objections have also been received that the *Ayer's Directory* and the *Editor & Publisher's Yearbook* should be made available to inmates. During the final settlement hearing, defendants and the TDC stated that they would be willing to make these publications "reasonably available to inmates." Based on this representation, the court overrules these objections on the condition that these publications are made reasonably available to inmates.

*Rule 3.9.5.2:* This new rule provides that the TDC will not suspend correspondence for sending contraband into the institution unless the contraband involved "presents a serious threat to the security of the institution and the safety of the staff and inmates." The TDC prior to agreement on this rule had the ability to suspend correspondence privileges for sending contraband of any type into the institution. Since stamps sent to an inmate are contraband, suspension of correspondence rights could be accomplished for a relatively minor infraction. The new rule is intended to prevent this result. The court finds that this new rule is more favorable to plaintiffs than the probable range of recovery at trial.

*Rule 3.9.6.1:* The TDC had taken the position that vendors or suppliers of stationery had to preregister with the TDC before

they would be allowed to send packages of stationery into the institution. The TDC has agreed in the new rule that such preregistration is not necessary. There had also been complaints that inmates were not notified when unauthorized packages were returned to the sender. The new rule contains a requirement that inmates will be notified in this situation. The Court finds that this rule is in both respects the best result plaintiffs could have expected at trial.

*Rule 3.9.6.2:* The old rule provided that packages must be free of contraband or material which constitutes a "clear and present danger to the security of the facility" or which cannot be lawfully sent through the mail. The TDC argued that the clear and present danger test is inappropriate when applied to physical contraband such as that which might be contained in a package. The rule has been changed to state that packages must be free of contraband or material "which constitutes a substantial danger to the security of the facility." The court finds that it is unlikely that plaintiffs could have successfully challenged this rule change if made by the TDC, and therefore finds the proposed rule within the range of probable recovery.

*Rule 3.9.6.3:* This rule is a new rule which puts time limits on TDC's handling of packages. The court finds that this rule is the best result plaintiffs could reasonably have achieved at trial.

*Rule 3.9.7.1:* The indigent postage rule has been modified in four ways. The most significant is that under the new rule postage and stationery will be supplied to those inmates who have less than $5.00 in their inmate trust fund account; previously these items were supplied only to those inmates who had no funds and the TDC was entitled to look not only to the trust fund but also "to other reliable sources" to determine the inmate's financial status. The court finds that this is a considerably better result than plaintiffs could have expected at trial, since this court had previously decided that postage need be supplied only to inmates with no funds in their trust fund account.

Second, indigent postage and stationery under the new rule will be secured through the mailroom or the warden's representative. Previously these items had been secured through the chaplain, a practice that was changed at Dr. Day's recommendation. The court finds that this change is the best result on this point plaintiffs could have expected at trial particularly in light of the questionable wisdom of judicial interference in such staffing matters absent agreement of the parties. Third, the old rule provided simply that an inmate may send five letters with indigent postage to general correspondents; the new rule specifies that inmates may send five "1-ounce domestic letters" to those persons or use postage equivalent thereto. This provision is a problematic one. The TDC argues that it must limit abuses of indigent postage use, and Dr. Day admitted that such abuses do occur. Because of this fact and because the rule provides for additional postage to be provided for good cause shown, the court finds the change to be within the range of probable recovery at trial. During the settlement hearing, Mr. Beaird testified that the TDC considers a need to correspond about legal matters to be good cause within the meaning of the rule and would be willing to put a statement to that effect in the SOP. On the condition that this is accomplished, objections to the limitation are overruled. Fourth, a new provision has been added as the last sentence of the rule requiring that postage and stationery must be made available to indigent inmates at regular intervals at least three times per week. The court finds this change to be within the range of probable recovery: it is unlikely that plaintiffs could have shown more frequent time periods to be required to protect their first amendment rights. Objections that more frequent intervals are required are therefore overruled.

*Rule 3.9.8:* A provision has been added to this rule requiring that inmates be notified when C.O.D. mail is returned to the sender. This result is the best plaintiffs could have expected at trial.

*Rule 3.9.9:* A requirement that an inmate sign for special, legal, and media correspondence before he is allowed to receive it has been deleted. No objections have been made to this rule, and the court finds it unlikely that plaintiffs could have secured this change at trial.

*Rule 3.9.10.6:* This rule dealing with the rejection of publications has been changed in two ways. First, Subpart "e" has been added. This subpart allows the TDC to reject a publication if "it contains material on the setting up and operation of criminal schemes or how to avoid detection of criminal schemes by lawful authorities charged with the responsibility of detecting such illegal activity." At trial, it is unlikely that plaintiffs could have successfully challenged this rule; the rule is therefore within the range of likely recovery. Second, the following language has been added to the rule:

> Publications shall not be excluded solely because they have sexual content. Publications that contain graphic depictions of homosexuality, sadomasochism, bestiality, incest or sex with children will ordinarily be denied. Publications that are primarily covering the activities in a sexual or political rights group or organization will ordinarily be admitted.

This new language reflects an agreement with the TDC that it will no longer ban all publications dealing with homosexual activities. In the past these publications have been banned on the theory that receipt of homosexual publications might flag an inmate as a homosexual within the institution. Under the new rule, only those publications containing graphic depictions will be denied. The new rule and the agreement it reflects abandoning the TDC's practice of banning all homosexual publications is likely to have been achievable by plaintiffs at trial. While the rule itself may not be the best possible result plaintiffs could have achieved, it is within the range of possible recovery and is a reasonable compromise given plaintiffs' chances of prevailing. Objections that the rule is too vague are overruled.

*Rule 3.9.11.2:* This rule is new. In the past, when the TDC rejected any publication, the publication was rejected in its entirety. Many inmates objected that they were frequently kept from receiving large publications merely because one small section was considered objectionable. Under the new rule, an inmate will have the option of receiving the publication with the objectionable material removed. The TDC will have an obligation to remove objectionable material at the inmate's request only if that material is contained on five or fewer pages (both front and back, which constitutes ten pages of written material) of the publication. The rule also provides that an inmate's approval of clipping of a publication does not waive his right to appeal the TDC's rejection of the clipped material. The rule is a reasonable compromise of plaintiffs' argument that only the smallest possible amount of material can be censored and the TDC's argument that the administrative burden of doing so would be too great; it is in the range of likely recovery. Objections that publications must be censored line-by-line and that objectionable material longer than five pages should be clipped are overruled. One objector also stated that clipping should be automatic to avoid mail lines; this problem is outweighed by the need to give inmates the choice of clipping or not and is therefore overruled.

*Rule 3.9.12.1:* Because of complaints that notarization services were not available within a reasonable time, a new sentence has been added to the rule providing that such services must be provided to inmates within 48 hours, or 72 hours on weekends, of a request. No objections have been made to this time limit, and the court finds this result is the best plaintiffs could reasonably have expected at trial.

*Rule 3.9.13:* The mail forwarding rule has in the past simply provided that mail received must be forwarded to an inmate in the event the inmate has left the unit and a forwarding address is available. Because the U.S. Post Office will not forward less than first class mail, the TDC has taken the position that it need not make any special

arrangements for newspapers and other subscriptions. Under the settlement, the TDC has agreed to forward newspapers by truck mail for seven days and other subscriptions for 45 days after an inmate is transferred between TDC institutions. These arrangements will be at no cost to the inmates. The court finds that the proposed rule is within the range of recovery plaintiffs were likely to achieve at trial, and objections to the time limits are therefore overruled.

*Rule 3.9.16:* The definition of contraband contained in this rule was changed to specify that contraband means only physical items "that present a substantial danger to the safety or security of staff, inmates or institution." *See* Rule 3.9.1.8, *supra.*

*Rule 3.9.18:* This new rule on administrative segregation provides that correspondence rights and the rights to receive packages and publications will not be abridged as to inmates in administrative segregation, but states that in documented cases in which the accumulation of property by an inmate in segregation presents a serious threat to the security of the institution, the right of an inmate to receive packages and publications and to accumulate property may be temporarily limited. The Court finds this result is nearly the best plaintiffs could have expected to achieve at trial.

*Rule 3.9.19:* This rule on punitive segregation is new. It provides that correspondence rights to send and receive general, special, legal, and media correspondence will not be abridged as to inmates in punitive segregation. It also states that inmates in punitive segregation will be provided with writing instruments, stationery and postage. The provision in the rule regarding receipt of publications by inmates in punitive segregation was an issue that has been tried by the parties before the court. The court has made separate findings of fact and conclusions of law on this provision, which follow findings and conclusions on the settlement agreement and the TDC rules. The balance of the rule represents nearly the best result plaintiffs could have achieved had they been successful at

trial. While specific times or periods for distribution of writing materials, postage, and mail might have been achievable through trial, the more likely result is represented by the proposed rule, which adequately protects plaintiffs' constitutional rights.

*Rule 3.9.20:* There had been complaints that the unit mailrooms were not opened on Saturdays, although the U.S. Post Office was. The new rule contains an undertaking by the TDC that unit mailrooms will remain open and mail service continue on Saturdays as long as the U.S. Post Office continues to operate on Saturdays. This rule probably could not have been achievable by plaintiffs at trial.

### C. Other Objections

The named class representatives are divided in their assessment of the settlement. Objections have been filed by more than 150 inmates although of this number 116 signed one pleading complaining principally of the definition of stationery. The percentage of the total class that objected is small. All objections that have been filed have been considered by the court. Except insofar as they have been considered in this opinion, they are overruled.

Considered as a whole, the settlement· is within the range of recovery plaintiffs were likely to achieve at trial. The court finds that the settlement approximates closely the likely result of a trial on the motion for injunction. Based on the conditions noted above with respect to Rule 3.9.4 and 3.9.7.1, the court therefore finds that the settlement as a whole is fair, adequate, and reasonable, and it is therefore approved.

### III

### DENIAL OF PUBLICATIONS IN PUNITIVE SEGREGATION

The TDC confines inmates in punitive segregation (solitary confinement) as punishment for inmates' violations of TDC Rules. While in punitive segregation, an inmate may receive and send legal, special, media, and general correspondence. Inmates, however, may not receive publica-

tions through the mail, such as books, magazines, and newspapers. The issue of whether inmates should be denied publications while in punitive segregation was one issue that the parties were unable to agree upon in their negotiations on the TDC correspondence rules. Accordingly, this issue was severed from the Settlement Agreement, and this Court held a separate hearing May 9, 1983.

■ In its earlier opinion in this case, this Court held that TDC may not infringe upon first amendment rights of an inmate in solitary confinement solely to enhance the punishment. *Guajardo v. Estelle*, 432 F.Supp. at 1384. At issue before the court was TDC's practice of suspending outgoing and media correspondence privileges of those inmates in solitary confinement. This court stated:

> The sole justification defendants offer in support of added restrictions on inmates in solitary is punishment. Defendants do not contend that suspension of general and media correspondence either improves security and order or facilitates inmate rehabilitation. Nor do they provide an explanation for their decision to suspend only outgoing correspondence. The court believes that any blanket suspension of correspondence unrelated to inmate abuse of the correspondence rules is unwarranted. The TDC may not infringe upon the first amendment rights of prisoners and their correspondence solely to enhance the punishment of inmates in solitary confinement.

*Id.* The question of denial of publications to inmates in solitary was not before this court. The holding of this court, however, is applicable. The right of inmates to receive information through the mails, in the form of publications, is a right protected by the first amendment. A blanket denial of such right solely for purposes of punishment, and not for a legitimate goal of TDC in maintaining security or order or in facilitating rehabilitation, would be unconstitutional. For prisoners retain "those first amendment rights not inconsistent with prison security, order or rehabilitation."

*Guajardo v. Estelle*, 580 F.2d 748, 760 (5th Cir.1978), *citing Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). First amendment challenges to prison regulations thus must be analyzed in light of the legitimate policies and goals of the prison system. *Id.*

TDC contends that the denial of publications in solitary maintains security and order within TDC. Specifically, defendants contend that the threat of solitary confinement deters inmates from violating TDC rules and to permit inmates in solitary confinement access to books, magazines, newspapers, and other such publications would "water down" the conditions in solitary and would make the threat of solitary confinement meaningless. Without the threat of solitary confinement, it would be difficult for TDC to maintain security and order within the prison. Defendants have also asserted that an accumulation of publications in solitary confinement would constitute a fire hazard, and that publications may be used by the prisoners as weapons or to make weapons. The defendants thus contend that the blanket denial of publications in solitary confinement serves in maintaining security and order within the prison.

The testimony at the punitive segregation hearing revealed that solitary confinement is a sanction used by TDC for the violation of TDC rules and regulations. An inmate may be confined in solitary for a maximum period of fifteen days. Intervals of at least three days are required between successive terms. During the interval, any publications withheld from the inmate are made available. The only reading materials available to the inmates in TDC while in solitary are legal books and materials and one religious book.

Testimony on the deterrent effect of solitary confinement was received from plaintiffs' expert witness, Gordon Kamka, who has correctional experience with the Maryland Department of Public Safety and Correctional Services and the Baltimore City

Jail. Mr. Kamka agreed that solitary confinement is a necessary disciplinary tool in prison systems because of its deterrent effect on inmate behavior. Mr. Kamka is of the opinion that the deprivations suffered by a TDC inmate in solitary confinement, other than the denial of publications, are sufficiently harsh to deter inmates from committing violations of the rules. He testified that, in his opinion, there is no relation between the denial of publications in solitary and institutional security.

The evidence introduced by plaintiffs during the hearing has little bearing on the relationship between the denial of publications in solitary confinement and institutional security. The plaintiffs' evidence revealed that an inmate's access to reading materials while in punitive segregation is considered an "essential" factor in the accreditation of correctional institutions,[1] and that many other state prison systems allow inmates in punitive segregation access to reading materials.[2] The issue before this court, however, is not whether TDC's practice of prohibiting an inmate in solitary access to any reading materials, other than legal books and materials and a religious book, violates an inmate's first amendment rights. Rather, the issue before this court is the constitutionality of the TDC mail rule, which does not allow an inmate to receive publications through the mail while in solitary confinement.

Defendants expert witnesses were J.D. Williams, Regional Director for the United States Bureau of Prisons in Dallas, Texas, and George W. Sumner, Warden of the Nevada State Prison and former Warden of San Quentin Prison in California. Mr. Williams testified that solitary confinement, in his opinion, serves two major purposes: deterrence and punishment. In the federal system, an inmate may be confined to solitary for up to 60 days. Unlike TDC, there may be two consecutive terms. Inmates may not receive publications, but do have access to reading materials from a library. Mr. Williams testified that if the period of solitary were shorter than 60 days, such as the 15 day period provided for in the TDC rules, he would be inclined to limit the inmate's access to reading materials. In his opinion, solitary confinement provides an inmate with time to reflect on his or her deeds. While other forms of punishment are available, such as loss of good time earned, solitary confinement is a more immediate form of punishment and is thus looked upon with more apprehension. Mr. Williams and Mr. Sumner both believe that the deterrent effect of solitary would be diluted if inmates were allowed to receive publications.

Defendants' witness Lester Beaird, TDC's Assistant Director for Treatment, testified that the prohibition of publications in solitary confinement serves TDC's goal of solitary as a form of punishment of inmate conduct and deterrent of similar conduct in the future. Mr. Beaird also testified that the accumulation of publications in solitary confinement would be a fire hazard. Mr. Beaird and defendant's witness Jack Garner, a warden at TDC, testified that publications in solitary confinement constitute a

---

1. The plaintiffs introduced the *Standards for Adult Correctional Institutions,* a manual written by the American Correctional Association and the Commission on Accreditation for Corrections. This manual contains guidelines for prison administrators, in an effort that adult institutions be operated in a manner consistent with minimum constitutional and human rights standards. The guidelines set out in the manual are labeled either mandatory, essential or important. In order to receive accreditation, an institution must comply with all of the mandatory standards, 90% of the essential standards, and 80% of the important standards. Access to reading materials while an inmate is in segregation is an "essential" standard.

2. The plaintiffs also introduced rules governing similar institutions in other 34 states. Having reviewed these rules, this court finds that 18 states allow inmates in a punitive form of segregation access to reading materials, not restricted to religious or legal materials: Arizona, California, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oregon, Wyoming, Louisiana, and Tennessee. Of these states, Maryland and Michigan expressly allow an inmate in punitive segregation receipt of publications through the mail. California and Louisiana expressly allow an institution to prohibit receipt of publications through the mail by an inmate in solitary.

security threat, because prisoners use the paper to make weapons.

The defendants offered evidence as to the frequency and percentage of solitary confinements in TDC. This evidence revealed that a significant majority of TDC inmates have never experienced solitary confinement and less than half of those who are confined in solitary return a second time. This shows that the negative perception of solitary confinement does have a deterrent effect. It is the opinion of defendant's witnesses that permitting publications in solitary confinement would erode the inmates' apprehension of solitary confinement.

■ As previously noted, prisoners retain those first amendment rights not inconsistent with prison security, order, or rehabilitation. *Guajardo v. Estelle,* 580 F.2d at 760. A prison rule may infringe on the inmate's first amendment rights if to do so is necessary to protect the governmental interest in security, order or rehabilitation, and if the rule is no greater than necessary to protect those legitimate interests. *Id. Procunier v. Martinez,* 416 U.S. at 413–14, 94 S.Ct. at 1811–12, 40 L.Ed.2d at 240; *Pell v. Procunier,* 417 U.S. at 822–33, 94 S.Ct. at 2804–09, 41 L.Ed.2d at 501–502.

■ On the basis of the evidence before this court, this court is of the opinion that TDC's practice of denial of publications received through the mail to inmates in punitive segregation serves TDC's legitimate interest in prison security and order.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that the settlement agreement be, and the same hereby is, approved as conditioned in these Findings of Fact and Conclusions of Law. It is further ORDERED that TDC's practice of denying publications received through the mail to inmates in punitive segregation does not violate the inmates' first amendment rights because the practice serves TDC's legitimate interest in prison security and order.

**FINAL JUDGMENT AND ORDER APPROVING SETTLEMENT**

The parties have executed and presented to the Court under Rule 23, F.R.C.P., a settlement agreement. Adequate notice was given to the class in accordance with the Court's Order of February 23, 1983, preliminarily approving the settlement. Objections to the settlement by class members and others were filed and considered by the Court, and a hearing to determine the fairness, reasonableness, and adequacy of the settlement was held. One issue, whether the TDC must give inmates in solitary confinement access to publications received through the mail, was not settled and was tried to the Court. Based on the Court's finding of fact and conclusions of law of July 8, 1983, it is hereby

ORDERED, ADJUDGED, AND DE-CREED THAT:

1. The settlement agreement of February 23, 1983, is hereby approved as fair, reasonable, and adequate, on the conditions that:

   (a) the defendants and the TDC make the *Ayer's Directory* and the *Editor & Publisher's Yearbook* referred to in Rule 3.9.4 reasonably available to inmates, and

   (b) the defendants and the TDC consider a need to correspond with general correspondents about legal matters to be "good cause shown" under Rule 3.9.7.1 and place a statement to that effect in the SOP.

2. All objections to the settlement are overruled.

3. TDC's practice of denying inmates in punitive segregation receipt of publications received through the mail serves TDC's legitimate interest in maintaining security and order and is therefore not a violation of the inmates' first amendment rights. Rule 3.9.19 is therefore approved as attached in Exhibit A.

4. Within thirty (30) days after the date of this order, defendants and the TDC shall adopt and implement the rules attached as Exhibit A hereto, in place of the current

Rule 3.9 of the Rules and Regulations and Grievance Procedures of TDC.

5.   Within thirty (30) days after the date of this Order, defendants and the TDC shall adopt and implement an internal monitoring procedure to ensure compliance with the rules.

6.   All costs, including costs of notice to the class, are to be borne by defendants.

7.   Plaintiffs' counsel, Vinson & Elkins, shall continue to represent the class in connection with any appeal of this settlement and any appeal of the publications in punitive segregation issue. They are relieved of any further responsibility as trial counsel. Plaintiffs' counsel are granted leave to seek within twenty (20) days of the date hereof an award of attorneys' fees with regard to the trial phase of the publications in punitive segregation issue and authorization to seek at an appropriate time an award of fees in connection with any appeal of the settlement and/or of the publications in punitive segregation issue.