

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-25-2005

# Banks v. Beard

Precedential or Non-Precedential: Precedential

Docket No. 03-1245

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Banks v. Beard" (2005). *2005 Decisions.* Paper 1492.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1492

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-1245
_____


RONALD BANKS, for himself and on behalf of all similarly
situated prisoners who are confined or will be confined in Long
Term Segregation Units of State Prisons located in the
Western Judicial District of Pennsylvania,

Appellant


v.


JEFFREY BEARD, in his official capacity as Secretary of the
Pennsylvania Department of Corrections


_____



On Appeal from the United States District Court
for the Western District of Pennsylvania

District Court Judge: The Honorable Terrence F. McVerry
(D.C. No. 01-cv-1956)


_____


Argued on October 22, 2003

Before: ALITO, FUENTES, and ROSENN, Circuit Judges

(Opinion Filed: February 25, 2005)


JERE KRAKOFF [Argued]
PA I.D. No. 13701

1

1705 Allegheny Building
Pittsburgh, PA 15219

*Counsel for Appellants*

D. MICHAEL FISHER
Attorney General

KEMAL ALEXANDER MERICLI [Argued]
Senior Deputy Attorney General

CALVIN R. KOONS
Senior Deputy Attorney General

JOHN G. KNORR III
Chief Deputy Attorney General
Appellate Litigation Section
Office of Attorney General
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh. PA 15219

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____


FUENTES, <u>Circuit Judge</u>

Ronald Banks, on behalf of himself and all other Level 2 prisoners confined in the Long Term Segregation Unit ("LTSU") of the State Correctional Institution at Pittsburgh ("SCI Pittsburgh"), challenges the constitutionality of the Pennsylvania Department of Corrections' ("DOC") policy banning access to newspapers, magazines and photographs for Level 2 inmates, arguing that the policy violates the prisoners' free speech rights under the First Amendment.

2

The District Court granted summary judgment to the defendant and upheld the policy as reasonably related to legitimate penological interests. We disagree and therefore will reverse.

## I. Factual and Procedural Background

The LTSU was established at SCI Pittsburgh in April 2000 as a place to confine a small population of inmates[1] which the DOC views, because of their history of behavior in prison, as too disruptive, violent or problematic to house elsewhere.[2] Inmates are classified at "Level 2" when admitted to the Unit, must remain there a minimum of 90 days, and may remain at Level 2 indefinitely. The length of time a prisoner may spend in the LTSU is open-ended and subject to the discretion of prison personnel.

Department policy prohibits Level 2 prisoners from receiving newspapers or magazines directly from the publisher, from the prison library, or from any other source for the duration of their confinement at Level 2 status unless the publication is religious or legal in nature. Individual articles clipped from publications are prohibited, unless they relate to the inmate or his family. Also prohibited is the possession or receipt of photographs of spouses, other family members, or friends.

---

[1]The maximum population in the LTSU is 40. (App. 92) Deposition testimony in this case discloses that, during the relevant period, the LTSU population was comprised of 36 Level 2 and three Level 1 inmates. (App. 93)

[2]The relevant DOC regulations state: "Any inmate who is, has or may be planning to engage in the following activities may be appropriate for assignment in the LTSU: (1) inmates who fail to complete SMU [Special Management Unit]; (2) serious escape history; (3) assaultive behavior with the intent to cause death or serious bodily injury; (4) injury to staff and/or inmates; (5) engaging in facility disturbance(s); (6) recorded history of exerting negative influence in facility activities; (7) Security Threat Group (STG) member or other unauthorized organization(s); (8) Perpetuated criminal activity that threatens the community; (9) a history of being a sexual predator; and/or (10) possessing weapons and/or implements of escape." 6.5.1 Administration of Security Level 5 Housing Units Procedure Manual at 1-16.

Other DOC rules which govern life at LTSU Level 2 prohibit inmates from having radios or televisions, permit phone calls only in emergencies or when related to inmates' legal representation, limit inmates to one visit with an immediate family member per month, and require inmates to remain in their cells 23 hours a day, one inmate to a cell. Inmates are permitted, however, religious or legal publications and paperback books that can be ordered from the prison library. To review legal materials, one LTSU inmate at a time may be let out of his cell and is escorted from it to a "mini law library" in hand and leg irons by two corrections officers. (App. 11)

The policy challenged here is unique in the state prison system, even among other segregated inmates. Level 1 LTSU inmates are permitted one subscription newspaper in their cells which can be exchanged on a one-for-one basis and are also permitted five subscription magazines at any given time.[3] Department policy also authorizes Special Management Unit ("SMU") inmates (another class of segregated inmates identified as being among the most difficult inmates in the system) to have various numbers of subscription newspapers, magazines and photographs in their cells, depending on their classification level. (App. 77) Similarly, dangerous inmates who are segregated in the Department's regular Restrictive Housing Unit on Administrative Custody status for security reasons are permitted one subscription newspaper in their cells which can be exchanged on a one-for-one basis, as well as subscription magazines and up to 10 photographs.

Deputy Superintendent Joel Dickson, who supervises the LTSU, testified in his deposition that the prohibition serves several penological purposes, which were reiterated by the defendant in its briefs. First, and emphasized by Dickson as most important, is behavior modification and rehabilitation. Dickson explained that in Level 2, inmates are deprived of certain privileges to create an incentive to comply with prison rules and thereby be removed to Level 1 and eventually to the general population. Among Level 1 inmates, the prospect of having the privileges denied discourages backsliding. Also, Dickson explained that as inmates improve their

---

[3]The photograph prohibition, however, remains unchanged.

behavior to earn privileges, they become better integrated members of prison society or, if released, better members of free society and "more productive citizen[s]." (App. 111) Second, the less material Level 2 prisoners have in their cells, the easier it is for correctional offices to detect concealed contraband and provide security. Third, newspapers and magazines can be rolled up and used as blow guns or spears, can fuel cell fires, or can be used as crude tools to catapult feces at the guards.

Plaintiff Ronald Banks filed the Complaint in this action on October 18, 2001. Seeking equitable and declaratory relief, the Complaint challenged the constitutionality of the DOC policy that denies Level 2 inmates access to newspapers, magazines and photographs of family members and friends. The inmates argued that, under Turner v. Safley, 482 U.S. 78 (1987), the policy offends their right to free speech either because it bears no rational connection to any legitimate penological interest or because it is an exaggerated response to such an interest. A motion for class certification was filed and granted on March 22, 2002. After discovery was completed, the parties filed cross-motions for summary judgment in September of 2002.

On November 15, 2002, Magistrate Judge Robert Mitchell recommended granting summary judgment to the DOC. The recommendation reasoned that the Turner factors weighed in the DOC's favor and that the policy was rationally related to, and furthered the legitimate penological interests of, institutional security and prisoner rehabilitation. Despite Banks' objections, on January 10, 2003 the magistrate's recommendation and reasoning were adopted by order of the District Court.

The District Court reasoned first that the policy is not an impermissible First Amendment violation because it is rationally related to the legitimate and interrelated penological interests in rehabilitation and security. It encourages compliance with prison rules and deprives especially incorrigible prisoners of material from which they can fashion crude weapons or feed cell fires.

Second, the District Court held that the policy is not an exaggerated response to the stated penological concerns. The court agreed with the DOC that inmates can meaningfully exercise the burdened First Amendment rights by qualifying with good

behavior for promotion to Level 1 or by corresponding with family and friends. Furthermore, given the particular intractability of Level 2 inmates, any further accommodation of their rights would impose costs that cannot be characterized as only *de minimus*.[4] Banks timely appealed the District Court's grant of summary judgment.

## II. Jurisdiction and Standard of Review

The District Court had original jurisdiction over the action pursuant to 28 U.S.C. §1343 because the claim asserts a violation of the First Amendment to the U.S. Constitution. This Court has appellate jurisdiction over the order of the District Court granting summary judgment pursuant to 28 U.S.C. § 1291. We review *de novo* the District Court's decision to grant the DOC's motion for summary judgment. See Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003). In reviewing the record, we view the evidence and any inferences therefrom in the light most favorable to the non-moving party, and resolve all factual conflicts in its favor. We reverse the District Court's decision where there are genuine issues of material fact precluding judgment as a matter of law. See Suders v. Easton, 325 F.3d 432, 440 (3d Cir. 2003).

## III. Discussion

### A. The *Turner* Standard

We have repeatedly echoed the Supreme Court's admonition that "prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Ramirez v. Pugh, 379 F.3d 122, 126 (3d Cir. 2004); Fraise v. Terhune, 283 F.3d 506, 515 (3d Cir. 2002) (quoting Turner, 482 U.S. at 84). In Turner, the Supreme Court acknowledged, however, that inmates' constitutional rights may in some cases be limited, and held that a prison regulation that impinges on inmates' constitutional rights "is

---

[4]Here, the DOC asserts the existence of the "ripple effect," cited in Turner, as a magnifier of cost in the prison environment. 482 U.S. at 90.

valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89.[5]

The Supreme Court articulated an analytical framework within which the reasonableness of such a regulation is assessed by weighing four factors. First, there must be a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89 (quotations omitted). Second, the court must determine "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90. Third, the court must assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates" and prison resources generally. Id. Finally, the court must consider whether there are "ready alternatives" to the regulation that "fully accommodate the prisoners' rights at *de minimus* cost to valid penological interests." Id. at 90-91. The existence of such alternatives is evidence that the regulation is an "exaggerated response to prison concerns." Id. at 90 (quotations omitted).

Although the Supreme Court emphasized that the judiciary is often "ill equipped to deal with the increasingly urgent problems of prison administration and reform," and should therefore give significant deference to prison officials in interpreting and implementing regulations,[6] the Court was not relinquishing the policing of prison policy to prison administrators. Id. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)). To the contrary, in Turner, while the Supreme Court upheld a rule barring inmate-to-inmate correspondence as reasonably related to legitimate security interests, it also struck down an inmate marriage restriction as an "exaggerated response to petitioners' rehabilitation and security concerns." Turner, 482 U.S. at 91. The Court held

_____

[5]Neither party contests that inmates have a First Amendment right to receive magazines and newspapers through the mail. See Allen v. Caughlin, 64 F.3d 77, 79 (2d Cir. 1995); Sizemore v. Williford, 829 F.2d 608, 610 (7th Cir.1987).

[6]As the District Court correctly pointed out, Fraise also asserted that particular deference to prison authorities is especially appropriate when a regulation implicates prison security. 283 F.3d at 516.

7

that the rule "sweeps much more broadly" than can be explained by the stated objectives and therefore failed the reasonable relationship test. Turner, 482 U.S. at 98.

As the Eleventh Circuit has aptly noted, "traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." Fortner v. Thomas, 983 F.2d 1024, 1029 (11th Cir. 1993) (citations omitted). If Turner is to be a meaningful limit on the discretion of prison administrators, its four factors must be diligently weighed by reviewing courts.

B.      Factor One: Rational relationship to legitimate penological interest

Banks argues that the connection between the policy and the valid penological objectives cited as its justification is too attenuated to be rational.

1.      Rehabilitation

Unlike the government's interest in security, the rehabilitation objective has never been defined by the Supreme Court, and its contours remain "quite amorphous and ill-defined." Ramirez, 379 F.3d at 128 (citing Amatel v. Reno, 156 F.3d 192, 209 (D.C. Cir. 1998) (Wald, J., dissenting)). Clearly, however, restrictive prison policies can be designed to target particular behaviors for which prisoners were incarcerated, or those that arose and presented security risks during incarceration.[7] Id.

The District Court essentially determined that (1) withholding privileges to get compliance is a sensible policy, and

_____

[7]In Waterman v. Farmer, for example, this Court upheld a prison regulation, justified as rehabilitative, which restricted sex offenders' access to pornographic materials. 183 F.3d 208, 215 (3d Cir. 1999). Prison authorities submitted affidavits from two psychologists who testified that pornographic materials threatened to thwart the effectiveness of the treatment given to sex offenders, and therefore that limiting access to such material was a sensible rehabilitation strategy.

8

(2) denying all other privileges short of access to publications and photographs had proven in the past not to be a sufficient incentive for behavior modification because, if it had been, inmates would not have been transferred to LTSU Level 2. Therefore, the District Court found that denying publications and photographs was a rational next step.

Certainly, "deterrence of future infractions of prison rules" is a legitimate penological interest. See Gregory v. Auger, 768 F.2d 287, 290 (8th Cir. 1985); Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983). In the Fifth and Eighth Circuits, temporary restrictions on prisoners' receipt of certain mail and subscription publications in disciplinary segregation have been upheld following exactly the logic advanced by the DOC here. Those courts held that such restrictions made disciplinary segregation less endurable and therefore discouraged inmates from the rule infractions that would lead to such segregation. See also Guajardo v. Estelle, 568 F. Supp. 1354, 1366 (D.C. Tex. 1983) (permitting inmates in solitary confinement access to books, magazines and newspapers may "water down the conditions in solitary and would make the threat of solitary confinement meaningless") (internal quotations omitted).

Although we agree that deterrence of future infractions of prison rules can be an appropriate justification for temporarily restricting the rights of inmates, we cannot say that the DOC has shown how the regulations in this case serve such a purpose. We recognize how such a rule could be reasonably related to a penological interest in rehabilitation in "disciplinary segregation" where inmates are placed for "specific rule infraction[s]" and for limited and specific periods, but this is not such a case. Spellman v. Hopper, 95 F. Supp. 2d 1267, 1281 (M.D. Ala. 1999).

Although the DOC asserts that LTSU is a "disciplinary" status, the LTSU Level 2 is a unique kind of segregation with characteristics of both disciplinary and administrative segregation. Inmates come to LTSU because of "unacceptable behaviors" in other institutions, but they have not all been adjudicated by a hearing officer to have violated the DOC's rules. (App. 95) The LTSU is not a place where inmates are sent for a discrete period of punishment, pursuant to a specific infraction, but is a place for

"Long Term" segregation of the most incorrigible and difficult prisoners for as long as they fall under that umbrella.

All LTSU inmates must spend 90 days at Level 2 status when they first arrive, and although their behavior will be reviewed every 30 days to determine whether they deserve promotion to Level 1, that determination is entirely within the discretion of prison administrators and is not linked to any particular infraction or compliance. While disciplinary segregation ordinarily has a specified duration, inmates may remain in Level 2 and under the publication ban indefinitely.[8] In fact, several inmates have remained in Level 2 since the LTSU's inception two years ago. As administered, it is unclear how the policy would achieve the deterrence it seeks. Not only is the rehabilitation justification illogical given the nature of LTSU confinement, but LTSU Level 2 is a far cry from the disciplinary contexts in which such bans have been deemed constitutional.

Furthermore, the DOC has offered no evidence that the rule achieves or could achieve its stated rehabilitative purpose. In Waterman, the DOC submitted affidavits from two psychologists who testified that pornographic materials threatened to thwart the effectiveness of the treatment given to sex offenders and who agreed that limiting access to such material was a sensible rehabilitation strategy. 183 F.3d at 215. In Guajardo, the defendants offered evidence as to the frequency and percentage of

_____

[8]In fact, disciplinary segregation is usually quite short in duration. In Daigre, after addressing a guard profanely, Daigre was put in "administrative and punitive lockdown" for "a maximum of 10 days' isolation" pursuant to a finding of "defiance." 719 F.2d at 1311. In Gregory, the challenged policy was in place for inmates on Disciplinary Detention Status, which carried with it a 60-day maximum duration. 768 F.2d at 290. In Guajardo, the court was evaluating a publication ban in place in solitary confinement, a type of punitive segregation used as a sanction for violation of Texas Department of Corrections rules and regulations. An inmate could be confined in solitary for a maximum of 15 days, and an interval of at least three days was required between terms in solitary, during which time the inmate could have access to any publications withheld during the term. 568 F. Supp. at 1366.

solitary confinements in the Texas Department of Corrections ("TDC") which showed that the negative perception of solitary confinement had a deterrent effect. 568 F. Supp. at 1368 ("a significant majority of TDC inmates have never experienced solitary confinement and less than half of those who are confined in solitary return a second time"). Here, there are <u>no</u> such supporting affidavits. The District Court presumably relied on Superintendent Dickson's testimony that the prohibition in question "gives us a means or method to say you comply, you modify your behavior, and you can obtain these things, these privileges," and his explanation that "we're very limited . . . in what we can and cannot deny or give to an inmate, and these are some of the items that we feel are legitimate as incentives for inmate growth." (App. 110) The District Court did not examine the fit between the policy and its rehabilitative goals, whether the ban was implemented in a way that could modify behavior, or inquire into whether the DOC's deprivation theory of behavior modification had any basis in real human psychology, or had proven effective with LTSU inmates. At oral argument, counsel for the DOC said it was a "hope." In fact, Banks argues that contrary to the assertions of the prison authorities and the District Court, isolating prisoners from the goings-on in the outside world tends to undercut any genuine rehabilitation. There is, again, no evidence in the record on this point, but Banks cites to language in several cases to support this assertion.[9] It certainly seems relevant

---

[9]Rehabilitative goals are "furthered by efforts to inform and educate inmates, and foster their involvement in the world outside the prison gates." <u>Abdul Wali v. Coughlin</u>, 754 F.2d 1015, 1034 (2d Cir. 1985). In <u>Spellman v. Hopper</u>, there was testimony that deprivation of reading materials in segregation can cause "psychological deterioration" which in turn can cause inmates either to be "very withdrawn and curl up in infancy, or [to] become acting out and aggressive people." 95 F. Supp. 2d at 1281; <u>see also</u> Morrison v. Hall, 261 F.3d 896, 904 n.7 (9th Cir. 2001) (citing studies and articles noting the "correlation between reading, writing and inmate rehabilitation").

to the above inquiry, as well as likely, that the ban may produce less rather than more compliance in at least some inmates.[10]

## 2. Security

With respect to security, the District Court held that there was a valid rational connection between the ban on periodicals and photographs in LTSU Level 2 and the constellation of security concerns put forth by the DOC. We cannot conclude from the record that such a connection exists. This is so for two reasons.

First, there is no evidence in the record of the misuse of periodicals or photographs in any of the ways described by the DOC. In fact, matches are not allowed in the LTSU. See also Gregory, 768 F.2d at 289 ("cellblock fires have been eliminated entirely . . . by new regulations prohibiting inmates from possessing matches"). There was no testimony as to the frequency of fires in the LTSU, nor testimony about any particular fires, in or out of LTSU segregation, and how and with what materials they

---

[10]Our dissenting colleague contends that we misapply the first Turner factor by requiring the DOC to show some evidence to support its contention that the rule achieves or could achieve its stated rehabilitative purpose. However, our insistence that the DOC offer some evidence is not, in our view, at odds with Turner but rather a complementary part of the analysis in determining whether an asserted goal is logically connected to the prison regulation. See Turner, 482 U.S. at 89 (requiring prison authorities to put forward a legitimate governmental interest justifying the regulation). Indeed, in Turner, the Supreme Court evaluated the evidence in determining whether the prison rules in question served - in theory or in practice - the alleged penological goals. See id. at 91-93, 98-99. In our view, the paucity of any such evidence in this matter reinforces the conclusion that there is no valid, rational connection between the DOC rule and its stated rehabilitative purpose.

were set and fueled.[11] The same is true for the materials' potential use as weapons.

Furthermore, there was no testimony as to the effect such a ban has had on the frequency of fires, be it in the LTSU or elsewhere. In fact, Banks points out that inmates on Death Row, in Administrative Custody, and in the Special Management Unit are routinely permitted to have these items, and the DOC presented no evidence that the security or operations of these units are negatively affected to any palpable degree by the presence of these items.

The District Court dismissed this argument, agreeing with the DOC that a comparison to other forms of segregation within the Pennsylvania DOC is irrelevant because LTSU inmates are the "worst of the worst." However, there is no evidence before us to indicate that what sets these inmates apart from the rest is their misuse of non-legal or non-religious periodicals. The District Court's conclusion that "the fact that other segregated inmates have not created the same security concerns while in possession of newspapers and magazines is one reason they are in those units and not in the LTSU" is an inference that finds no support in the record. In fact, there is no indication in the record that any LTSU inmates were transferred there because they had created a security risk with periodicals or photographs. The LTSU inmates are certainly and unquestionably incorrigible, but whether their incorrigibility takes the form described by the District Court is an open question which cannot be resolved at the summary judgment stage by making inferences in favor of the DOC and without support in the record.

Second, we agree with Banks that given the materials Level 2 inmates are permitted in their cells, prohibiting a single newspaper or magazine has no significant relationship to the stated security objectives. There are many other non-prohibited means

_____

[11]Superintendent Dickson testified only that within the last six months there were "no more than two or three" cell fires in the entirety of the LTSU, and "paper products generally are the way it's first ignited." He also testified that he did not know of any instance where a LTSU Level 1 inmate used a newspaper or magazine to start or fuel a fire. (App. 112)

for the inmates to fuel fires, hurl waste, conceal contraband and create weapons. Under current regulations, each inmate is given a jumpsuit, a blanket, two bedsheets, a pillow case, a roll of toilet paper, a copy of a prison handbook, ten sheets of writing paper, several envelopes, carbon paper, three pairs of socks, three undershorts and three undershirts, and may at any point also have religious newspapers, legal periodicals, a prison library book, Bibles, and a lunch tray with a plate and a cup. Many of these items are flammable, could be used for the above purposes as effectively as a newspaper, magazine or photograph, and have been so used by LTSU Level 2 inmates.[12] The District Court again agreed with the DOC that the prohibition may not eliminate but certainly reduces the security risks with which the DOC is concerned, and that it is irrelevant that the policy does not absolutely prevent the harms it addresses because Turner is not a "least-restrictive-alternative" test. Fraise, 283 F.3d at 520; Waterman, 183 F.3d at 219.

Although the District Court is correct that the policy need not be narrowly tailored to the harm it addresses to pass constitutional muster, its conclusion here has some flaws. Even if the policy need not be "narrowly tailored" to the stated interests, if the prohibition of newspapers, magazines and photographs has only a minimal effect on security in the LTSU because of the other materials that they are permitted in the cells, the relationship between the policy and the penological interest may be too attenuated to be reasonable.[13] It is important to note here that the

---

[12]In his deposition, Superintendent Dickson testified not only that under the challenged policy there have still been cell fires and rashes of feces-flinging in LTSU level 2, but also that inmates can and do use other permitted materials to create these disturbances: "Oftentimes it's with the cups that they're given for their drinks, things like that . . . a piece of paper or whatever . . . that they can use to give a little leverage and fling the materials." (App. 112)

[13]See Spellman, 95 F. Supp. 2d at 1278; Jackson v. Elrod, 671 F. Supp. 1508, 1511 (N.D. Ill. 1987) aff'd, 881 F.2d 441 (7th Cir. 1989) (admission that hardcover books are no greater a risk to conceal contraband than, for example, clothing, paperbacks, mattresses and light fixtures, "disproves defendant's assertion of a rational connection between their hardcover book ban and a

inmates are not requesting unlimited access to innumerable periodicals but for the ability to have one newspaper or magazine and some small number of photographs in their cells at one time. We fail to see how the DOC could have reasonably thought that the challenged policy, which permits an inmate to have in his cell 10 sheets of writing paper and one records center box full of legal or religious periodicals or texts, would meaningfully improve prison security by forbidding him one copy of the *Graterfriends* prison newsletter.[14]

The District Court asserted that the prohibited materials are "more likely" to be used to create a security concern and are "most easily and commonly used as weapons or to set fires and fling feces" than religious or legal materials, and therefore the link between the policy and the stated interest is more than tenuous. (App. 125) However, nowhere in Dickson's affidavit does he describe specific incidents where the prohibited materials were used in any manner posing a security risk by LTSU inmates before or after they were transferred to LTSU. He articulates his belief that periodicals are more well-suited to create particular weapons, but admits that the items already in inmates' cells certainly could

---

governmental interest"); Mann v. Smith, 796 F.2d 79, 82-83 (5th Cir. 1986) (ban on newspapers and magazines represents exaggerated response to legitimate need to preserve discipline and maintain security); Kincaid v. Rusk, 670 F.2d 737, 744 (7th Cir. 1982) (total ban on newspapers unjustifiable when hazards of newspaper possession could as well be caused by reading material detainees were permitted to have); Payne v. Whitmore, 325 F. Supp. 1191, 1193 (N.D. Cal. 1971) ("Jail cells are already filled with an abundance of materials quite suitable for fire starting . . .; yet no one suggests that cells ought to be stripped of bedding, clothing, toilet paper, writing materials, and so on.").

[14]In a memo dated February 8, 2001, and distributed to LTSU inmates, Superintendent Dickson stated that the publication *Graterfriends* is a newsletter, not legal mail, and therefore denied to Level 2 inmates. *Graterfriends* is a Pennsylvania-based newsletter published under the auspices of The Pennsylvania Prison Society to which prisoners contribute and which is distributed to prisoners and other members of the corrections community.

and have been used to fuel fires, hide contraband, fling feces and create weapons. (App. 112)

### C. Factor two: <u>Means for exercising the burdened right</u>

Under this factor, we are asked to "focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity." <u>DeHart v. Horn</u>, 227 F.3d 47, 53 (3d Cir. 2000) (en banc). If other avenues are open for the inmate to exercise the right in question, the court should exhibit deference to the judgment of corrections officials, while if no other avenues are available, the inmate's right is given greater weight in the Turner balancing process. <u>Id</u>.[15]

Banks argues that while Level 2 inmates can read leisure books, they have no meaningful access to current news accounts or published information about current political, social, or other public events and activities occurring outside the prison walls, and they have no way to look at images of loved ones and friends apart from the possibility of infrequent visits. The District Court, however, disagreeing with Banks, found that inmates had sufficient means to engage in the constitutionally-protected activities.

The District Court characterized the periodicals ban as "not a blanket prohibition" because Level 2 inmates can qualify by good conduct to be promoted to LTSU Level 1. The District Court's justification for this determination is its explanation that "each of these prisoners has the option of modifying his behavior and being promoted to a less restricted environment where access to newspapers magazines and photographs may be enjoyed." (App. 126) As the DOC elaborated in its brief, "there is no reason to suppose that a prison administration would not respond favorably to a prisoner's initiative to qualify for relief from the ban on periodicals or photos through exhibiting good behavior."

---

[15]Although this inquiry depends in part on how the scope of the constitutional right is defined, neither the parties nor the District Court define the right in question, nor does the District Court's analysis depend on a particular understanding of the rights in question.

The District Court and the DOC are correct in noting that inmates can be promoted from Level 2 to Level 1 and, if they are, they will gain access to the prohibited materials. However, that does not change the fact that the prohibition is indeed a "blanket" one, and that as long as an inmate is at Level 2 status and is subject to the policy in question, he has no alternative means to exercise his First Amendment right of access to a reasonable amount of newspapers, magazines, and photographs.

Moreover, there is no reason to infer that the process of "promotion" from Level 2 to Level 1 is as much under the inmates' control as the DOC and the District Court characterize it. As noted above, segregation in Level 2 is not linked to a particular infraction, and is of potentially unlimited duration. Any inmate who enters LTSU will remain at Level 2 for 90 days no matter how he modifies his behavior. Furthermore, the only information in the record as to how the process works is the following explanation from Dickson's deposition:

> You know, you have the ability through your own actions to be promoted, if you will, from a level 2 inmate to a level 1 inmate, and we do that every day. We have a system where the unit management team reviews each inmate's progress every thirty days. The unit management team is made up of the unit manager, custody staff, psych staff, nursing staff. And we try to give and provide every inmate every opportunity to progress through this system and to be able to obtain these privileges. (App. 110)

There are no affidavits in the record from any of those decision-makers mentioned by Dickson, nor is there any documentation of the review process. Although at Dickson's deposition, Banks' attorney apparently examined and requested some documents which indicated, with respect to current LTSU inmates, how long they had been at the facility and how long they had been at Level 2, those documents are also not in the record. Again, unlike the policies in solitary and disciplinary confinement examined in Daigre, Gregory, and Guajarde, the LTSU prohibition cannot be characterized as merely a "time, place or manner" restriction. See, e.g., Gregory, 768 F.2d at 290 ("[the policy is] not

17

directed at what mail an inmate could receive, but only at when he could receive it").

### D.    Factors Three and Four : Accommodation

We now consider the District Court's analysis of <u>Turner</u>'s third and fourth factors. Under these factors, we must determine whether the right in question can be accommodated without significant negative consequences in terms of efficiency and security, <u>DeHart</u>, 227 F.3d at 58, and "whether the prison can easily serve its interests with alternative means without infringing upon the rights of prisoners," <u>Crofton v. Roe</u>, 170 F.3d 957, 959 (9th Cir. 1999). The Supreme Court has suggested that the "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 418 (1989) (citation and quotations omitted).

In <u>Fraise</u>, inmates challenged a policy which authorized prison authorities to designate and transfer core members of "Security Threat Groups" as violative of the First Amendment's Free Exercise Clause, as well as the Equal Protection and Due Process Clauses.[16] The Court determined that the third prong weighed in favor of the DOC and, quoting <u>Turner</u>, stated that "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." <u>Fraise</u>, 283 F.3d at 520 (quoting <u>Turner</u>, 482 U.S. at 90). It is certainly supported by the record, as the District Court repeatedly asserted, that the LTSU Level 2 inmates are some of the most "intractable" in the Pennsylvania prison system. We cannot agree, however, on the record before us, that accommodation of those prisoners' rights by giving them reasonable access to a limited number of periodicals and photographs would have such a "ripple effect."

---

[16]A Security Threat Group ("STG") is a group of inmates, designated by the Commissioner, which "poses a threat to the safety of staff, other inmates, the community, and/or damages to, or destruction of property, and/or interrupting the safe secure and orderly operation of the correctional facility(ies)." <u>Fraise</u>, 283 F.3d at 509.

At no point does Banks propose that Level 2 inmates be allowed unmitigated and unregulated access to all periodicals. Rather, Banks proposes, and the District Court discussed, two alternative policies which would accommodate the prisoners' rights. First, the DOC could establish a specific reading period, or several different reading periods, in which guards deliver a single newspaper or magazine to an inmate's cell, if requested, and retrieve it at the close of the period. The DOC could easily control the number of periodicals in his cell at one time, the frequency of the distributions, the amount of time any inmate would be in possession of the materials, as well as the number of inmates who would have periodicals in their cells at any one time.[17] The DOC could also limit the total number of photographs a Level 2 inmate could have in his cell at one time to what they consider a reasonable number. In conjunction with this policy, access to periodicals could be entirely withheld from those individual prisoners who, in the judgment of prison officials, <u>would</u> pose a particular risk given their records, or those inmates who <u>have</u> abused their use of periodicals or photographs. The DOC asserts that such a limited restriction would not prevent Level 2 inmates from using the materials to start fires, fling feces and create weapons and therefore, during the reading period, extra monitoring of cells would be required, thus affecting the prison's resources and possibly the safety of other inmates.

We fail to see, however, as discussed above under factor one, how an inmate's hour-long possession of *Graterfriends* would require further monitoring when at any time that inmate may be in possession of 10 sheets of writing paper, and as many copies of the <u>Watchtower</u>, the <u>Jewish Daily Forward</u>, and the <u>Christian Science Monitor Magazine</u> as can fit in a records center box. As discussed above, the District Court's assumption that prisoners would be more reluctant to use religious materials for such nefarious purposes is unsupported by the record. Furthermore, at any point, the entire LTSU can house no more than 40 inmates, one-tenth of one percent of the state's prison population. (App. 95) Even if limited distribution of periodicals were to require additional

---

[17]Volume control is a well-recognized alternative to the blanket exclusion of items protected by the First Amendment. <u>See</u> <u>Clement v. California Dept. of Corrections</u>, 220 F. Supp. 2d 1098, 1113 (N.D. Cal. 2002); <u>Spellman</u>, 95 F. Supp. 2d at 1286.

monitoring, such an accommodation would have a minimal impact on prison resources.

Alternatively, individual prisoners could be escorted to the secure mini-law library to read a periodical of their choosing. Again, the District Court found that such an accommodation would intensify security concerns by increasing the amount of inmate movement and thereby placing a formidable burden on LTSU staff.[18] Inmates are already permitted to leave their cells under guard escort to use the library to view legal materials, so individual inmate escort has not been deemed prohibitively burdensome or dangerous by prison administrators. Although it is possible that the demand for mini-law library sessions may increase if the policy were changed, the DOC has not shown how this would significantly increase the burden on prison staff. Superintendent Dickson explained in his deposition that under current LTSU policy, one inmate is allowed out of his cell at a time to visit the law library for one two-hour session. A roster of requests, like a waiting-list, is maintained and fulfilled on a first-come first-serve basis. The amount or frequency of inmate movement is already regulated. If the inmates' rights to read other periodicals were accommodated, that would not change. We fail to see how the mere addition of non-legal and non-religious periodicals to the materials already available to the inmates in the library would create the "ripple effect" cited by the DOC. In short, the DOC has not shown that a change in the publication ban would mean "significantly less liberty and safety for everyone else, guards and

---

[18]Here, the District Court relies on Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 530 (E.D. Pa. 2002), in which the court found that the third Turner factor weighed in the prison authorities' favor because the inmate was particularly ill-behaved and accommodating his presence at religious services would require more monitoring of those services, thereby straining prison resources and affecting the prison staff and other inmates. Although the Turner factors are evaluated independently, it is important to note with respect to this decision that the prison policy was much narrower and the court's analysis was informed by the fact that the inmate had many meaningful ways to practice his religion without attending services. He could meditate, pray and study his religion, as well as discuss it with other inmates outside his cell. Id.

20

other prisoners alike." <u>Abbott</u>, 490 U.S. at 418 (quoting <u>Turner</u>, 482 U.S. at 92).

Finally, the District Court asserted that the alternatives proposed come at more than a *de minimus* cost to the DOC's behavior modification goals because the accessibility of periodicals would render the threat of Level 2 segregation toothless as a deterrent. However, the District Court overlooked the extent to which, even without the challenged restriction, Level 2 LTSU segregation is more restrictive than Level 1 in significant respects. For example, Level 1 inmates are permitted two family visits and one fifteen minute telephone call per month. They are also permitted to spend $5.00 per week at the commissary on items defined by the Unit Team. Additionally, while inmates at both levels receive in-cell counseling and visits from chaplains, and can be employed as Unit Janitor, only Level 1 inmates receive compensation as per DC-816 Inmate Compensation System, and only Level 1 inmates are permitted GED and Special Education in-cell study. (App. 32)

## IV. Conclusion

For the reasons stated above, we believe that the DOC's policy that prohibits inmates confined in the LTSU at Level 2 status access to photographs, and all newspapers and magazines which are neither legal nor religious in nature, cannot be supported as a matter of law by the record in this case. Accordingly, the summary judgment of the District Court will be reversed and the case remanded for further proceedings consistent with this opinion.

ALITO, <u>Circuit Judge</u>, dissenting:

At issue in this case are restrictions that the Pennsylvania Department of Corrections imposes as a last resort on the most disruptive and dangerous .1% of its prison population. These restrictions apply only as long as an inmate remains in Level 2 of the LTSU, an assignment that may terminate after as little as 90 days. The question before us is whether these temporary, last-resort restrictions are facially unconstitutional under the standard set out in <u>Turner v. Safley</u>, 482 U.S. 78 (1987), a standard that instructs courts to extend considerable deference to judgments of

21

correctional officials. Because I believe that the majority has misapplied Turner, I must respectfully dissent.

Under Turner, prison regulations that restrict constitutional rights must be sustained if they are "reasonably related to legitimate penological interests." 482 U.S. at 89. Turner noted four factors to be considered in determining whether the requisite reasonable relationship exists: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates"; and (4) whether there are "ready alternatives" to the challenged regulation." Id. at 89-90 (citation omitted). I will address each factor.

**First factor: Rational relationship between regulation and legitimate penological interests.** I agree with the District Court that this factor weighs in favor of the constitutionality of the challenged regulations because there is a "rational" relationship between that restriction and the legitimate penological objective of deterring misconduct. It is "rational" for corrections officials to think that inmates who are not in Level 2 will be deterred from engaging in serious misconduct because they do not want to be transferred to that unit and thus to be subjected to the restrictions that accompany that assignment. It is also "rational" for corrections officials to think that inmates who are in Level 2 will be deterred from engaging in serious misconduct while in that unit because they wish to be transferred out and thus to escape such restrictions.

The majority disagrees with these conclusions for two reasons. First, the majority apparently believes that a sanction cannot deter unless a potential violator knows with some specificity the type misconduct that will result in the imposition of the sanction and the length of time that the sanction will last. The majority concedes that "deterrence of future infractions of prison rules can be an appropriate justification for temporarily restricting the rights of inmates" and that other courts of appeals have sustained rules restricting the receipt of newspapers by prisoners in disciplinary segregation. See Maj. at 9 (citing Gregory v. Auger,

22

768 F.2d 287, 290 (8th Cir. 1985); <u>Daigre v. Maggio</u>, 719 F.2d 1310, 1313 (5th Cir. 1983)). The majority finds these precedents inapplicable because the "LTSU is not a place where inmates are sent for a discrete period of punishment, pursuant to a specific infraction, but a place for 'Long Term' segregation of the most incorrigible and difficult prisoners for as long as they fall under that umbrella." <u>Id</u>.

The majority's reasoning is unsound. The uncertainties noted by the majority may diminish the deterrent effect of the regulations on some inmates who are not yet in Level 2, but there is no reason to think that these uncertainties entirely eliminate the deterrent effect of the regulations on the general prison population. Similarly, it is rational to believe that the challenged restrictions provide an incentive for those inmates who are already in Level 2 to refrain from disruptive behavior in the hope of obtaining a transfer out of the unit. Again, uncertainty about what must be done to obtain such a transfer or about when such a transfer may be available may have an impact on the degree of the incentive, but there is no reason to suppose that the incentive is wholly destroyed.

Second, the majority concludes that the regulations are not rationally related to the goal of deterring misconduct because "the DOC has offered no evidence that the rule achieves or could achieve its stated rehabilitative purpose." Maj. Op. at 10. In taking this approach, the majority misconstrues the nature of the first <u>Turner</u> factor. This factor requires us to determine whether there is a "*logical connection* between the regulation and the asserted goal," see 482 U.S. at 89 (emphasis added), not whether there is empirical evidence that the regulation in fact serves that goal. The entire system of prison discipline might be imperilled if each sanction for prison misconduct could not be sustained without empirical evidence that the sanction provided some incremental deterrent.

**Second factor: alternative means of exercising the right.** This is the most troubling of the four factors, but I do not think that it is sufficient to support the majority's conclusion that the regulations are facially unconstitutional. The regulations impinge upon the right to receive information about current events and communications (in the form of photographs) from family members and friends, but the restrictions are not absolute. Inmates

23

in Level 2 may still read books from the prison library and may receive letters. Moreover, as the District Court noted, inmates in Level 2 have the "option of modifying their behavior and being promoted to a less restricted environment." Report & Recommendation at 8. An as-applied challenge by an inmate subjected to lengthy confinement in Level 2 despite a record of reformed behavior would present different considerations, but the majority's opinion is not limited to such a case.

**Third and fourth factors: Availability and impact of accommodation.** The majority proposes modifications in prison policies that would almost certainly have an impact on prison resources. The majority first suggests that guards could deliver requested newspapers and magazines to inmates' cells and then retrieve these materials after the expiration of a specified "reading period." Maj. Op. at 18. Providing this service for each of the 40 inmates in Level 2 would be time consuming. "Alternatively," the majority states, "individual prisoners could be escorted to [the] secure mini-law library to read a periodical of their choosing." Maj. Op. at 19. This service, however, would undoubtedly impose a significant burden, particularly since the inmates in question are those whom the Department of Corrections has classified as the most violent and disruptive. It is Department policy that Level 2 inmates may not be transported from their cells unless they are placed in hand and leg irons and are escorted by two officers.

Taking into account all four of the Turner factors, I conclude that the challenged regulations are not facially unconstitutional. On their face, these regulations are reasonably related to the legitimate penological goal of curbing prison misconduct, and I would therefore affirm the decision of the District Court.